1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   JOSHUA WARD, and FONDA WARD,
                                         NO. CIV. S-04-0678 FCD PAN
13
              Plaintiffs,
14                                       MEMORANDUM AND ORDER
         v.
15
     CALIFORNIA DEPARTMENT OF
16   TRANSPORTATION/CALTRANS;
     CALIFORNIA AMTRAK; STATE OF
17   CALIFORNIA; JACOB KEATING;
     COUNTY OF SACRAMENTO; COUNTY
18   OF YOLO; CITY OF WEST
     SACRAMENTO; UNION PACIFIC
19   RAILROAD, a business
     organization of unknown
20   status; and DOES 1-50,
     inclusive,
21
              Defendants.
22
     _____/
23
                                ----oo0oo----
24

25        This matter is before the court on motion by defendants

26   National Railroad Passenger Corporation[1] ("AMTRAK") and Union

27   Pacific Railroad Corporation ("Union Pacific")(collectively

28
     _____

          [1]    This defendant was erroneously sued as "California
     Amtrak."

1  referred to as "defendants"), for summary judgment pursuant to

2  Fed. R. Civ. P. 56(c).[2]  Plaintiffs, Joshua and Fonda Ward

3  ("plaintiffs"), oppose the motion.  For the reasons stated

4  herein, defendants' motion is GRANTED in part and DENIED in

5  part.[3]

**BACKGROUND**

7      Following are the facts construed in the light most

8  favorable to the plaintiffs.  Plaintiffs Joshua and Fonda Ward,

9  who were in the process of relocating from Georgia to Oregon,

10 arrived in Sacramento on or about March 6, 2003. (Dep. of Joshua

11 Ward ("Ward Dep.") at 12:13-25, Ex. D to Dec. of An H. Nguyen in

12 Supp. Summ. J.)  The couple made a camp on the outskirts of

13 Riverwalk Park in West Sacramento. (Ward Dep. at 13:11-24.)  The

14 city of West Sacramento is separated from the city of Sacramento,

15 immediately to the east, by the Sacramento River.

16     The I-Street Bridge, which is owned and maintained by Union

17 Pacific, is a two-level bridge located just west of the Union

18 Pacific passenger station platform.  (Resp. UF ¶¶ 12, 13; Dec. of

19 Brian P. Heikkila ("Heikkila Dec.") ¶ 13.)  The upper level of

20 the bridge contains a street for motor vehicle traffic and a

21 sidewalk for pedestrian traffic. (Ward Dep. at 19:11-17; Heikilla

22 Dec.¶ 13.)  The lower level of the bridge contains two sets of

23 mainline train tracks.  (Resp. UF ¶ 13.)  Between the two sets of

24

25     [2]  The motion was originally schedule for hearing on May
27, 2005.  Prior to the hearing on the motion, the parties filed
a stipulation to continue the hearing on the motion until July
26 22, 2005.

27     [3]  Because oral argument will not be of material
assistance, the court orders the matter submitted on the briefs.
28 E.D. Cal. Local Rule 78-230.

1  tracks runs what plaintiffs describe as a "catwalk", which is

2  "wire grate that you can walk on." ((Dep. of Kenneth Lothridge

3  ("Lothridge Dep.") at 121:22-24, Ex. J to Resp. UF; Resp UF ¶

4  13.)   The catwalk is utilized by Union Pacific employees for

5  maintenance and to investigate train malfunctions. (Dep. of

6  Steven B. Strickland ("Strickland Dep.") at 40:13-41:7, Ex. E to

7  Resp. UF.)   It also is used frequently by trespassers.

8  (Strickland Dep. at 44:9-12.)   During the two days prior to the

9  accident, while the Wards were camping in West Sacramento, Mr.

10  Ward crossed the river eight to ten times, from West Sacramento

11  to Sacramento and back, using the lower level if the I-Street

12  Bridge.   (Pls.' Statement of Issues and Disp. Material Facts in

13  Opp'n Summ.J.   ("Resp. UF") ¶ 22.)   During a previous trip to

14  Sacramento a year earlier, Mr. Ward also crossed the bridge's

15  lower level on several occasions.

16      On the morning of March 9, 2003, Mr. and Mrs. Ward were

17  preparing to depart Sacramento and continue their journey to

18  Oregon.   (Ward Dep. at 30:16-22.)   They packed their belongings

19  and walked east across the lower level of the I-Street Bridge to

20  the Shell Station on Richards Boulevard in Sacramento.   (Id. at

21  30:22-31:4.)   At this point, Mr. Ward decided to return to West

22  Sacramento to purchase cigarettes at a mini-market located

23  approximately one block from the west end of the bridge.[4]   (Id. at

24  31:2-10.)   He left his wife at the Shell Station and began the

25  walk back over the lower level of the bridge.   (Id.)   When Mr.

26

27      [4]   According to Mr. Ward, he was returning to the mini-
market in West Sacramento because it sells "Rollings" for "only
28  1.59 a packet."   (Ward Dep. at 31:5-7.)

1  Ward was approximately three quarters of the way across, he was

2  struck by a train operated by Amtrak.  Mr. Ward's left leg was

3  severed below the knee, and he was thrown from the bridge onto

4  the dirt riverbank below.

5                              **STANDARD**

6      The Federal Rules of Civil Procedure provide for summary

7  adjudication when "the pleadings, depositions, answers to

8  interrogatories, and admissions on file, together with

9  affidavits, if any, show that there is no genuine issue as to any

10 material fact and that the moving party is entitled to a judgment

11 as a matter of law."  Fed. R. Civ. P. 56(c).  One of the

12 principal purposes of the rule is to dispose of factually

13 unsupported claims or defenses.  Celotex Corp. v. Catrett, 477

14 U.S. 317, 325 (1986).

15      In considering a motion for summary judgment, the court must

16 examine all the evidence in the light most favorable to the

17 non-moving party.  United States v. Diebold, Inc., 369 U.S. 654,

18 655 (1962).  If the moving party does not bear the burden of

19 proof at trial, he or she may discharge his burden of showing

20 that no genuine issue of material fact remains by demonstrating

21 that "there is an absence of evidence to support the non-moving

22 party's case."  Celotex, 477 U.S. at 325.  Once the moving party

23 meets the requirements of Rule 56 by showing there is an absence

24 of evidence to support the non-moving party's case, the burden

25 shifts to the party resisting the motion, who "must set forth

26 specific facts showing that there is a genuine issue for trial."

27 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

28 Genuine factual issues must exist that "can be resolved only by a

1  finder of fact, because they may reasonably be resolved in favor

2  of either party." Id. at 250.  In judging evidence at the

3  summary judgment stage, the court does not make credibility

4  determinations or weigh conflicting evidence.  See T.W. Elec. v.

5  Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.

6  1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

7  Corp., 475 U.S. 574, 587 (1986)).  The evidence presented by the

8  parties must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory,

9  speculative testimony in affidavits and moving papers is

10  insufficient to raise genuine issues of fact and defeat summary

11  judgment.  See Falls Riverway Realty, Inc. v. City of Niagara

12  Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc.

13  v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

15      The moving defendants seek summary judgment of all claims

16  asserted against them in plaintiffs' complaint.

17

18  **A.   Claims One and Two – Premises Liability and Nuisance against Amtrak**

19      The undisputed evidence demonstrates that Amtrak neither

20  owns nor operates the I-Street Bridge or adjacent land.  (Resp.

21  UF ¶ 12.)  To be subject to premises liability or liability for

22  nuisance, the defendant must be the owner or occupier of the

23  land.  See Ruoff v. Harbor Creek Community Assn., 10 Cal. App.

24  4th 1624, 1628 (1992)(holding that an owner or occupier of real

25  property generally must exercise ordinary care in managing the

26  property.")(citing Cal. Civ. Code § 1714(a)); Preston v. Goldman,

27  42 Cal. 3d 108, 114 (1986)(holding that former owners' liability

28  for patent defects in pond ended with their transfer of

1   possession and control of the property.)   Plaintiffs put forth no

2   argument in opposition to summary judgment of these claims. As a

3   result, the court grants defendants' motion for summary judgment

4   of Claims One and Two against defendant Amtrak.

5   **B.   Claim Three - Negligent Operation of Train against Amtrak**

6        Amtrak argues that plaintiffs' claim for negligent operation

7   of the train is preempted by the Federal Rail Safety Act of 1970

8   ("FRSA"), 49 U.S.C. § 20101, et seq.[5]   Alternatively, Amtrak

9   asserts that plaintiffs' claims fail on the element of causation.

10       **1.   Preemption**

11       The FRSA was enacted "to promote safety in every area of

12  railroad operations and reduce railroad-related accidents and

13  incidents."   49 U.S.C. § 20101.   To give effect to this broad

14  mandate, the Secretary of Transportation is authorized to

15  "prescribe regulations and issue orders for every area of

16  railroad safety."   49 U.S.C. § 20103.   Pursuant to this

17  authority, the Secretary, by delegation to the Federal Railroad

18  Administration ("FRA"), promulgated regulations setting maximum

19  train speeds for various classes of train track.   See 49 C.F.R. §

20  213.9.   The track where the accident occurred is classified as

21  Class 2.   (Resp. UF ¶ 15.)   Under 49 C.F.R. § 213.9, the maximum

22  allowable operating speed for passenger trains on Class 2 tracks

23  is thirty miles per hour.   It is undisputed that the train which

24  struck Mr. Ward was not exceeding this speed.

25       The preemptive effect of the FRSA and its implementing

26  regulations is governed by 49 U.S.C. § 20106, which contains

27  ────────────────

28       [5]   Formerly codified at 45 U.S.C. § 434, et seq.

1  express preemption and savings clauses.[6]  It is well established

2  that common law negligence claims based on excessive train speed

3  are preempted under § 20106 and 49 C.F.R. § 213.9.  CSX

4  Transportation, Inc. v. Easterwood, 507 U.S. 658, 670 (1993).

5      Plaintiffs do not dispute this general rule, but argue that

6  the savings clause contained in § 20106 saves their claim from

7  preemption because a more stringent local ordinance was enacted

8  to "eliminate or reduce an essentially local safety or security

9  hazard."  Plaintiffs' argument fails.  First, the "ordinance"

10 cited by plaintiffs is not a "state law, regulation or order."

11 Rather, it appears to be Union Pacific's internal "Timetable

12 Restriction" which sets a twenty mile-per-hour maximum speed for

13 the I-Street Bridge.[7]  (See Dec. of Leonard Sandoval in Supp.

14 Summ. J. ¶ 3.)  Section 20106 permits a "state," to adopt more

15 stringent laws and regulations that survive preemption in certain

16

17

18   [6]   Section 20106 provides in relevant part:
     Laws, regulations, and orders related to railroad
     safety and laws, regulations, and orders related to
19   railroad security shall be nationally uniform to the
     extent practicable. . .   A State may adopt or continue
20   in force an additional or more stringent law,
     regulation, or order related to railroad safety or
21   security when the law, regulation, or order--
     (1) is necessary to eliminate or reduce an essentially
22   local safety or security hazard;
     (2) is not incompatible with a law, regulation, or
23   order of the United States Government; and
     (3) does not unreasonably burden interstate commerce.

24
     [7]   Neither party provides the court with the language of
25 the speed restriction or a definition of a "Timetable
   Restriction."  However, the court's independent research reveals
26 that train timetables "govern[] regularly scheduled trains on a
   specific route.  It sets forth the route to be followed,
27 scheduled stops, speed limits or restrictions, superiority of
   trains, and other necessary information for safe railroad
28 operations."  See 27 Am. Jur. 2d Proof of Facts § 471.

1  contexts.[8]   The internal policies of Union Pacific, which is not

2  a governmental entity, are irrelevant to the preemption issue.

3  See Michael v. Norfolk Southern Railway Co., 74 F.3d 271, 273

4  (noting that a "railroad's own speed regulations may be evidence

5  of negligence in state tort claim for excessive speed; however,

6  such a state tort claim is preempted by federal law and the

7  internal railroad regulations would be irrelevant under federal

8  law.")

9     Moreover, even if Union Pacific's Timetable Restriction was

10  a "state law, regulation or order," it is not saved from

11  preemption by § 20106 because such a restriction is not

12  "necessary to eliminate or reduce an essentially local safety or

13  security hazard."  49 U.S.C. § 20106.  In Union Pacific Railroad

14  Co. v. California Public Utilities Comm'n, 346 F.3d 851 (9th Cir.

15  2003) ("Union Pacific v. CPUC"), the Ninth Circuit recently

16  addressed § 20106's savings clause and concluded that an

17  "essentially local safety hazard" is one "which is not adequately

18  encompassed within national uniform standards."  Id. at 860

19  (citations omitted).  The court then determined that a ten-mile

20  segment of track, with an abnormally high derailment rate, a

21  sharp curve and steep grade, which was near an environmentally

22  sensitive water source, did not fall within the "essentially

23  local safety hazard" savings clause.  Id. at 860-861.  The court

24  reasoned that all steep grades and sharp curves increase the risk

25

26     [8]   Some courts have determined that § 20106's savings
   clause does not apply to municipal ordinances.  See e.g.,
   Baltimore and Ohio Railroad Co. v. City of Piqua, 1986 WL 8254
27  (S.D. Ohio, June 30, 1986).  However, as the Timetable
   Restriction at issue here is not a local ordinance, the court
28  need not address this issue.

1  of derailment and that many areas of track in the United States

2  share similar characteristics, which can be encompassed within

3  national uniform standards.  Since the FRA is aware of the

4  dangers presented by such areas they are not essentially local

5  safety hazards.  Id. at 61.

6      Here, plaintiffs provided little evidence or argument to

7  support their contention that the I-Street Bridge presents an

8  essentially local safety hazard.  Rather they simply assert that

9  the "urban setting of the depot and bridge" creates a "localized

10 safety hazard."  (Pls.' Mem. Opp'n Summ. J. at 11.)  However,

11 presumably many train depots and bridges are located in urban

12 areas throughout California and the United States.  Following the

13 reasoning of Union Pacific v. CPUC, this type of safety hazard

14 can be addressed at the federal level.  Thus, plaintiffs' common

15 law negligence claim for excessive speed is preempted by the

16 FRSA.

17     Plaintiffs also argue that their negligent operation claim

18 is not limited to excessive speed.  The pertinent language in the

19 complaint provides:

20     Third Cause of Action Negligent Operation of Train . .
       . Jacob Keating was the engineer of train 727 and was
21     either stopped or just leaving the Amtrak station . . . .
       when he noticed plaintiff Joshua Ward crossing the I-
22     Street Bridge railroad tracks in front of him.  Rather
       than waiting until it was safe to proceed, defendant
23     Jacob Keating, then traveling at an excessive speed for
       the conditions, struck and seriously injured plaintiff
24     Joshua Ward . . ..

25 (Complaint ¶ 33.)  According to plaintiffs, the above referenced

26 language alleges negligent conduct, in addition to excessive

27 speed.  Specifically, they note that the complaint "clearly

28 refers to Keating's actions, namely proceeding in an unsafe

9

1  manner by not slowing down or otherwise stopping the train before

2  hitting plaintiff, as negligent.  (Pls.' Mem. Opp'n Summ. J. at

3  12.)  Plaintiffs have simply repackaged their excessive speed

4  claim under the vague rubric of "proceeding in an unsafe manner."

5  However, the specific conduct plaintiff's identify as "proceeding

6  in an unsafe manner" is Keating's *failure to slow down or stop*.

7  While presumably a person could fail to slow down or stop for

8  several reasons, plaintiffs have identified none except

9  "excessive speed for the conditions."  Consequently, plaintiffs'

10  negligent train operation claim is preempted by the FRA.

11

12  **C.   Claims Four and Five - Premises Liability and Nuisance
       against Union Pacific**

13       In the complaint, plaintiffs allege that Union Pacific

14  "negligently and carelessly constructed, designed, maintained,

15  supervised, managed and/or controlled the vicinity of the

16  accident, the tracks, bridge and entries thereto, so as to fail

17  to adequately protect persons from entering the bridge or protect

18  persons such as [Mr. Ward] who were known to cross the bridge."

19  (Pls.' Comp. ¶ 40.)

20       Union Pacific contends that summary judgment of plaintiffs'

21  premises liability and nuisance claims is warranted because it

22  had no duty to warn Mr. Ward regarding the danger posed by the

23  railroad tracks, which presented an open and obvious danger.

24  Alternatively, Union Pacific contends that plaintiffs cannot

25  demonstrate the element of causation because "Mr. Ward's

26  decisions and actions were the substantial factor in causing his

27  injury."  (Defs.' Mem. Supp. Summ. J. ("Defs.' Mem.") at 21.)

28  / / /

1       **1.   Duty**

2       Duty is a question of law for the court and can be properly

3  decided in the context of a summary judgment motion based upon

4  the evidentiary showings of the parties.  <u>Silva v. Union Pacific</u>

5  <u>Railroad Co.</u>, 85 Cal. App. 4th 1024, 1029-1030 (Cal. App. 2000)

6  In such context, the court has an "established factual universe"

7  to make the decision as to whether a legal duty exists.  (<u>Id.</u> at

8  1030.)

9       Under California law, "[e]veryone is responsible, not only

10 for the result of his or her willful acts, but also for an injury

11 occasioned to another by his or her want of ordinary care or

12 skill in the management of his or her property or person, except

13 so far as the latter has, willfully or by want of ordinary care,

14 brought the injury upon himself or herself."  Cal. Civ. Code §

15 1714(a).  This duty of ordinary care extends to the owners and

16 occupiers of land.  <u>See</u> <u>Rowland v. Christian</u>, 69 Cal. 2d 108,

17 112-119 (Cal. 1968)(rejecting common law status-based approach to

18 land-owner liability and adopting duty of ordinary care, absent

19 compelling policy reason not to impose duty).  In certain

20 circumstances, where clearly supported by public policy, courts

21 will recognize an "exception to the general principle that a

22 person is liable for injury caused by the failure to exercise

23 reasonable care."  <u>Silva</u>, 85 Cal. App. 4th at 1028-1029; <u>Rowland</u>,

24 69 Cal. 2d at 112.  The factors used to determine whether an

25 exception is warranted are: the foreseeability of harm to the

26 plaintiff, the degree of certainty that the plaintiff suffered

27 injury, the closeness of the connection between the defendant's

28 conduct and the injury suffered, the moral blame attached to the

1 defendant's conduct, the policy of preventing future harm, the

2 extent of the burden to the defendant and consequences to the

3 community of imposing a duty to exercise care with resulting

4 liability for breach, and the availability, cost, and prevalence

5 of insurance for the risk involved.  Rowland, 69 Cal. 2d at

6 112-113; Silva, 85 Cal. App. 4th at 1028-1029.

### a.    Foreseeability

8     In determining duty, the court does not decide "whether a

9 particular plaintiff's injury was reasonably foreseeable in light

10 of a particular defendant's conduct."  Brooks v. Eugene Burger

11 Management Corp., 215 Cal. App. 3d 1611, 1620 (1989).  Rather,

12 the court "evaluate[s] more generally whether the category of

13 negligent conduct at issue is sufficiently likely to result in

14 the kind of harm experienced that liability may appropriately be

15 imposed on the negligent party."  Id.

16     The court finds that the category of negligent conduct

17 alleged here - failing to prevent individuals from using the

18 walkway between the railroad tracks through fencing, warnings or

19 policing – was sufficiently likely to result in injury to

20 individuals who frequently cross the lower level of the bridge.

21 The I-Street Bridge is located in the heart of highly populated

22 area – downtown Sacramento.  Most importantly, Union Pacific knew

23 trespassers frequently used the walkway on the lower level of the

24 bridge to cross the river to and from West Sacramento.[9]

25

26     [9]    Plaintiffs' request for judicial notice of the November
27, 2001 Sacramento Bee article and November 26, 2001 Office of
27 Emergency Services report is DENIED.  These facts are not
properly subject to judicial notice.  Fed.  R. Evid. 201(b).
28                                                    (continued...)

12

1  (Strickland Dep. at 44:9-19; Dep. of John W. Allen ("Allen Dep.")

2  at 89:5-24, Ex. F to Resp. UF.)  Union Pacific employees made

3  contact with an average of 430 persons per year approaching or on

4  the lower level of the bridge.  (Allen Dep. at 89:5-24.)  It is

5  not difficult to foresee that such a known trespassing problem,

6  if left unchecked, could result in injury.

7      The facts presented here are clearly distinguishable from

8  those in <u>Abboud v. Union Pacific Railroad Co.</u>, No. 02-4140 (N.D.

9  Cal.), which is relied on by Union Pacific.  In that case, the

10 district court found that the harm suffered by an individual

11 struck by a train on an open segment of track in Hayward,

12 California was not foreseeable.  However, in that case, there was

13 no evidence that Union Pacific had knowledge that "trespassers

14 tended to cross the tracks at that particular location near

15 milepost 21 [where the plaintiff was injured]."  <u>Id.</u>, slip op. at

16 12.  By contrast, here, plaintiffs have presented evidence, which

17 Union Pacific does not dispute, that it had knowledge that

18 trespassers routinely crossed the precise location where the

19 injury occurred, the lower span of the I-Street Bridge.

20     Union Pacific also argues that it had no duty to fence, warn

21 or otherwise prevent individuals from accessing the walkway on

22 the lower section of the bridge because the railroad tracks were

23 an open and obvious danger.  While train tracks generally do

24

25

26     [9](...continued)
   Plaintiffs and defendants make numerous other evidentiary
   objections to statements and exhibits submitted by the other
27 party.  However, it is unnecessary to rule upon these objections
   to dispose of defendants' motion except as otherwise noted by the
28 court.

1  present an open and obvious danger, Mr. Ward testified that he

2  knew that the lower span of the bridge was used by members of the

3  public, that he himself had crossed the lower span on multiple

4  occasions without incident, that he had never seen a "No

5  Trespassing" sign, and had never actually seen a train cross the

6  bridge.  Under such circumstances, a person could discount the

7  risk of using the walkway.

8       Finally, Union Pacific contends that, although it knew

9  trespassers frequently used the walkway, it could not foresee the

10 harm to Mr. Ward because any such use was careless since there is

11 a safe route across the river on the upper level of the bridge.

12 While there is an alternate route, this does not diminish the

13 fact that Union Pacific knew a significant number of individuals

14 continued to use the lower span.[10]  Moreover, the cases cited by

15 Union Pacific, Pineda v. Ennabe, 61 Cal. App. 4th 1403 (Cal. App.

16 1998) and Edwards v. State of California, 206 Cal. App. 3d 1284,

17 did not conclude that the injuries sustained in those cases were

18 unforeseeable due to the carelessness of the plaintiffs; rather

19 they concluded that no duty was owed, *despite* the foreseeability

20 of the risk, for policy reasons.  See e.g., Pineda, 61 Cal. App.

21 4th at 1409 ("The purpose for requiring a duty . . . is to avoid

22 the extension of liability to every conceivably foreseeable

23 accident, without regard to common sense or good policy.")  More

24

25       [10]    "Although duty is primarily a question of law, its
   existence may frequently rest upon the foreseeability of the risk
26 of harm.  Foreseeability may be decided as a question of law only
   if, under the undisputed facts, there is no room for reasonable
   difference of opinion."  Silva, 85 Cal. App. 4th at 1029.  Here,
27 the facts submitted on which the court relies are undisputed and
   thus it is appropriate to resolve the question of duty as a
28 matter of law.

1  importantly, in neither of those cases were the defendants on

2  notice that individuals frequently engaged in the precise conduct

3  that caused the harm.  See Pineda (noting that no similar

4  incidents had occurred in defendant's building); Edwards, 206

5  Cal. App. 3d at 1286 (citing no evidence that other sports fans

6  had attempted to climb fence or been harmed as a result and

7  noting that no incidents were reported at the fence over twelve-

8  year period).  By contrast, here Union Pacific was well aware

9  that trespassers routinely crossed the lower level of the bridge.

10  Thus, the court concludes that the type of harm suffered by Mr.

11  Ward in this case was foreseeable.

12  **b.   Degree of Certainty of Injury to Mr. Ward**

13  Parties agree that the harm suffered by Mr. Ward satisfies

14  the element of certainty of injury in favor of finding a duty.

15  **c.   Closeness of connection between Mr. Ward's
Injuries and Union Pacific's Conduct**

16  In analyzing the closeness of connection, the court

17  evaluates whether the causal link between the injury and the

18  negligence of the defendant is so attenuated that liability

19  should not be imposed.  Bryant v. Glastetter, 32 Cal. App. 4th

20  770, 781 (1995).  The court finds that there is a close

21  connection between Mr. Ward's injuries and Union Pacific's

22  failure to prevent trespassers from using the lower span of the

23  bridge to cross the river.  While Union Pacific offered

24  substantial evidence regarding its efforts to prevent trespassing

25  on the thousands of miles of track in the Oakland division, it

26  did not explain what measures were taken to prevent trespassing

27  on the lower span of I-Street Bridge, which is located in a

28

15

1  highly-populated area and used routinely by trespassers to cross

2  the river.   Plaintiff offered declarations from individuals who

3  "have crossed the lower part the [sic] I Street Bridge where the

4  trains run countless times," and "have never been asked to leave

5  or told that [they] could not cross there." (See Decls. of Bridge

6  Users.)   More to the point, the individuals all testified that

7  the Union Pacific employees they met "simply said hello," and did

8  not prevent them from crossing the bridge.   (See id.)

9              **d.    Moral Blameworthiness.**

10     The court also must evaluate whether Union Pacific's conduct

11  is morally blameworthy.   Rowland, 69 Cal. 2d at 113.   The moral

12  blame attendant to the defendant's ordinary negligence is

13  generally insufficient to find moral blameworthiness.   Adams v.

14  City of Fremont, 68 Cal. App. 4th 243, 270 (1998).   Courts

15  require a higher degree of culpability, such as where the

16  defendant (1) intended or planned the harmful result, (2) had

17  actual or constructive knowledge of the harmful consequences of

18  their behavior, (3) acted in bad faith or with a reckless

19  indifference to the results of their conduct, or (4) engaged in

20  inherently harmful acts.   Id. (citations omitted).   Here, there

21  is undisputed evidence that Union Pacific knew trespassers

22  routinely used the lower level of the I-Street Bridge.   On the

23  other hand, there is no competent evidence that similar accidents

24  had occurred on the bridge.   In addition, Union Pacific had some

25  programs in place to prevent trespassing – at least at a national

26  and/or regional level.   While these programs may not have been

27  adequate to address the specific trespassing problem on the I-

28  Street Bridge (this is a question for the trier of fact), it is

1 | clear that Union Pacific was not entirely indifferent to the risk

2 | of harm.  Thus, the court cannot conclude that Union Pacific's

3 | conduct was morally blameworthy.

4 |          **e.    Policy of Preventing Future Harm and the Extent of**
   |                 **the Burden to Union Pacific and Consequences to**
5 |                 **the Community of Imposing a Duty**

6 |      The court next must determine whether imposition of

7 | liability would further the policy of preventing future harm and

8 | the extent of burden on the defendant and public in imposing such

9 | a duty.  As noted previously, Union Pacific was aware that

10 | trespassers frequently crossed the lower span of the bridge.

11 | Public policy supports imposition of a duty to take reasonable

12 | steps to prevent trespassing, through warnings, fencing or

13 | policing, where the defendant is aware of trespassing over a

14 | bridge in a highly-populated area.  While the potential for

15 | liability will impose burdens on Union Pacific, they are not as

16 | great as Union Pacific contends.  The trespassing situation

17 | presented here is unique in that the trespassing occurred over a

18 | railroad bridge, rather than on an open span of track, Union

19 | Pacific knew that trespassers routinely crossed this precise

20 | section of tracks, and the bridge is located in the center of an

21 | urban area.  Requiring Union Pacific to use ordinary care to

22 | prevent trespassing *in such circumstances* will not expand

23 | liability to injuries suffered by trespassers in remote areas

24 | where it has no notice that routine trespassing occurs.  See

25 | Leslie G. v. Perry & Associates, 43 Cal. App. 4th 472, 480 (1996)

26 | (noting that "[I]n cases where the burden of preventing future

27 | harm is great, a high degree of foreseeability may be

28 | required.....") (quoting Ann M. v. Pacific Plaza Shopping Center,

17

1  6 Cal.4th 666, 678-679 (1993).

2              **f.    Availability, cost and prevalence of insurance**

3       Both parties agree that this factor is irrelevant in this

4  case.

5       In summary, the Union Pacific has not established that the

6  <u>Rowland</u> factors analyzed above support creating an exception to

7  the general rule that Union Pacific, as an owner/occupier of

8  land, owes a duty of ordinary care, as articulated in Cal. Civ.

9  Code § 1714.  The court finds that Union Pacific owed such a

10  duty.

11      **2.   Causation**

12      Union Pacific asserts the same causation argument as Amtrak.

13  <u>See</u> <u>supra</u> Section B.  For the same reason, the court rejects

14  Union Pacific's legal argument and finds that plaintiffs have

15  raised a triable issue as to causation.

16                              **CONCLUSION**

17      For the foregoing reasons, the defendants' motion for

18  summary judgment is granted in part and denied in part as

19  follows:

20      1.   Defendants' motion for summary judgment of Claims One

21  Two and Three against Amtrak is GRANTED.

22      2.   Defendants' motion for summary judgment of Claims Four

23  and Five against Union Pacific is DENIED.

24      IT IS SO ORDERED.

25  DATED: July 22, 2005

26                              /s/ Frank C. Damrell Jr.
                                FRANK C. DAMRELL, Jr.
27                              UNITED STATES DISTRICT JUDGE

28

                                    18